```
                    UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF MISSISSIPPI
                         NORTHERN DIVISION

SOUTHPOINT BANK                                        PLAINTIFF

VS.                          CIV. ACTION NO.: 3:21-CV-156-TSL-MTP

ORIGIN BANK F/K/A COMMUNITY
TRUST BANK                                             DEFENDANT

PLANTERS BANK & TRUST COMPANY
AND PEOPLES BANCSHARES, INC.
D/B/A PEOPLES BANK                                    PLAINTIFFS

VS.                          CIV. ACTION NO.: 3:21-CV-381-TSL-MTP

ORIGIN BANK F/K/A COMMUNITY
TRUST BANK                                             DEFENDANT

FIRST BANK                                             PLAINTIFF

VS.                          CIV. ACTION NO.: 3:21-CV-392-TSL-LGI

ORIGIN BANK F/K/A COMMUNITY
TRUST BANK                                             DEFENDANT
```

MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of plaintiffs
Planters Bank & Trust Company (Planters Bank) and Peoples
Bancshares, Inc. d/b/a Peoples Bank (Peoples Bank), joined by
plaintiff First Bank, for temporary restraining order and
preliminary injunction, pursuant to Rule 65 of the Federal Rules
of Civil Procedure.  A number of additional motions have been
filed relating to this motion, including an emergency motion by

plaintiffs for expedited discovery; a motion by First Bank to strike portions of the affidavit of Bryan Burgess submitted by defendant Origin Bank f/k/a Community Trust Bank (Origin) in response to plaintiffs' TRO motion; and a motion by Origin to file a surrebuttal on the TRO motion or, alternatively, to strike portions of plaintiffs' rebuttal and exhibits.  For reasons explained herein, the court concludes that the motion by Planters Bank/Peoples Bank, joined by First Bank, for TRO should be denied, as should their motions for expedited discovery and to strike portions of the affidavit of Bryan Burgess[1].  The court further concludes that Origin's motion to file a surrebuttal should be granted in part and denied in part.[2]

Background

On June 16, 2014, Origin entered into a Construction Loan Agreement with Haven Campus Communities-Starkville, LLC (Haven

---

[1]    The court denies the motion to strike the affidavit of Burgess for the reasons well stated by Origin in its response to that motion.

[2]    In this motion, Origin objects to plaintiffs' assertion of new positions/arguments in their rebuttal – of which there are several instances – and also to plaintiffs' citation of additional authorities and submission of additional exhibits. There is no valid basis for striking the additional authorities or exhibits.  As to plaintiffs' new arguments/positions, most of which are recognized, though not necessarily extensively addressed herein, the court will grant Origin's motion to file a surrebuttal.

or Borrower) by which Origin agreed to loan Haven $18,615.081.00 to construct and operate a student-apartment complex in Starkville, Mississippi.  The loan was secured by a deed of trust and an assignment of rents, as well as a personal guaranty executed by Stephen H. Whisenant, John A. Williams, Jr., Watkins J. Blane, Jr. and Mark Boutwell.  In 2016, Origin entered into separate participation agreements with five banks by which it sold participation interests totaling 95% of the subject loan.[3] More particularly, on June 1, Origin entered into separate participation agreements by which each of the following banks purchased an undivided participation interest in the loan: First Bank (28%), Planters Bank (19%), Peoples Bank (14%), and Bank of Montgomery (12%); and on July 15, Origin and Southpoint Bank entered a participation agreement by which Southpoint purchased a 22% interest in the loan.

---

[3]    Briefly, "a participation is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender. … The participant is not a lender to the borrower and has no contractual relationship with the borrower.  The participant's only contractual relationship is with the lender; the participant has no ability to seek legal recourse against the borrower…."  In re AutoStyle Plastics, Inc., 269 F.3d 726, 736 (6th Cir. 2001).  See also Hibernia Nat'l Bank v. Federal Deposit Ins. Corp., 733 F.2d 1403 (10th Cir. 1984) ("The lead is the only secured party.  The 'participants' can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers.").

Under the express terms of each of these agreements, Origin is the "lead bank" with the sole right and responsibility to service the loan and enforce the obligations of Haven and the guarantors under the loan documents and guaranty agreement.  On this point, each agreement recites:

> [Participant] shall not have any right or responsibility to enforce the obligations of Borrower or any other party under the Loan Documents, and except as expressly provided herein to the contrary, all rights pursuant to the Loan Documents (or otherwise) of [Origin] to secure or enforce payment of the obligations of Borrower, or any Guarantor under the Loan Documents shall be so held (and such right shall be exercised solely by and at the option of [Origin] for the pro rata benefits of [Origin] and [Participant] collectively.

Each agreement purports to give Origin the right to enter into any amendment or modification of, or to waive compliance with the terms of any loan document,[4] without the consent of the participants, except that the participation agreements of Peoples Bank, Planters Bank, First Bank and Bank of Montgomery each requires notice and consent of participants holding in the aggregate an interest in seventy-five percent or more of the

---

4    The references to "loan documents" in the participation agreements, and in this opinion, include the several agreements executed by and between Origin and Haven relative to the subject loan, including the Construction Loan Agreement; Promissory Note; Construction Deed of Trust, Assignment of Leases and Rents, and Security Agreement; and Assignment of Leases and Rents.

4

outstanding principal balance of the loan for any "material
change" in the loan terms, including, *inter alia*, a change in
the payment amount or interest rate, postponement of a payment
due date (including final maturity date), and a waiver of
compliance with the borrower's financial covenants as set forth
in the loan agreement.  The agreements further recite:

> [Origin] shall be entitled, at its option, and without
> the consent of [participants] from time to time, and
> at any time, to exercise any rights or remedies under
> on in respect of any Loan Document, or refrain from
> exercising any right or remedy, upon the occurrence of
> a default under the Loan Documents or at any other
> time.

In administering the loan, Origin was required by the
participation agreements to exercise the same care it would
exercise with respect to similar transactions entered into
solely for its own account; after default by the borrower, its
duty of care in connection with the enforcement of its rights
under the loan documents was and is the same as would reasonably
be expected of similarly situated lenders with similar loans.
The agreements each provide, however, that Origin will not be
liable for any actions taken or omitted and will not be
responsible for the consequences of any error of judgment,
except for such actions taken or omitted "which constitute
willful misconduct or gross negligence."

On October 28, 2020, Southpoint wrote to Origin, demanding

that Origin repurchase its participation interest.  Southpoint
objected that, despite Haven's having been in default under the
loan agreement since at least 2018, both by failing to pay the
2018 and 2019 property taxes and failing to maintain the
required debt service coverage ratio, Origin had refused to
enforce its rights under the loan documents and thereby had
committed acts or omissions that Southpoint maintained amounted
to gross negligence or willful misconduct.  In addition,
Southpoint charged that Origin had violated the notice and
consent provision in the Peoples Bank participation agreement –
to which Southpoint claimed to be a third-party beneficiary – by
waiving the debt service coverage requirement without notice to
and consent of participants holding seventy-five percent of the
outstanding loan balance.

     In an October 30 letter to Origin, Peoples Bank, echoing
Southpoint's position, also demanded that Origin repurchase its
participation interest.  Origin refused both requests, denying
the substance of the allegations against it and insisting that
by the clear terms of their agreements, they were not entitled
to a repurchase of their interests under any circumstances.[5]

---

5    Each agreement states, "[Origin] shall have no obligation
to repurchase the Participation upon any default by Borrower
under any of the Loan Documents or in any other event
whatsoever."

Haven subsequently defaulted on the loan by failing to pay the outstanding balance by the November 20, 2020 final maturity date.  According to plaintiffs, in the weeks preceding Haven's default, Haven and the guarantors negotiated with Origin in an attempt to restructure the loan; and although Origin was apparently agreeable to Haven's "one-sided, risky proposal" and recommended to the participants that they approve it, the participants refused.

Following default, Origin made formal demand for payment by letter of December 23, 2020, and when payment was not forthcoming, Origin filed suit against Haven and the guarantors in this court on January 29, 2021, demanding recovery for breach of the loan documents and guaranty agreement.[6]  A month later, on March 1, Southpoint filed suit against Origin in this court, demanding compensatory and punitive damages based on allegations that Origin's breaches of the participation agreement, as identified in Southpoint's October 28, 2020 demand letter, resulted from gross negligence and willful misconduct.

At that point, Peoples Bank, despite having previously threatened to do so, had not yet filed suit against Origin. It did, however, complain to Origin in a letter dated March

---

6    The related lawsuit by Origin against Haven and the guarantors is referred to herein as the collection action.

7

31, 2021 about the "slow pace and ineffectiveness of Origin's collection efforts."  Peoples Bank demanded to know why Origin had not taken action to immediately enforce the assignment of rents that secured, in part, the loan; why Origin had not immediately moved for summary judgment on the note and guaranty; and what Origin's plans were to redeem the property.  Within two weeks of this letter, Origin had filed a motion for temporary restraining order and preliminary injunction to enforce the assignment of rents by enjoining Haven from using any monies collected from the property for anything other than payment of the outstanding loan balance, and it had moved for summary judgment against Haven and the guarantors.

On April 20, 2021, prior to the start of the hearing on Origin's TRO motion, the parties in the collection action requested that the court reset the hearing for a later date, advising, in substance, that Origin had agreed that it would withdraw the motion if Haven and the guarantors timely satisfied certain conditions demanded by Origin.  Based on the parties' announcement, the court rescheduled the hearing on Origin's TRO motion for May 17.  Ultimately, however, the hearing was cancelled because on May 11, 2021, Haven filed a Chapter 11 bankruptcy petition in the bankruptcy court for the Northern

District of Mississippi.

On May 12, counsel for Peoples Bank, Planters Bank and Bank of Montgomery, purporting to write on behalf of and with the approval of all the participant banks, wrote to Origin, charging that with respect to the loan, Origin and its counsel had failed to act in good faith and in the participant banks' best interests and that its actions instead "appear[ed] to be designed to protect the guarantors of the loan to the detriment of the participating banks."  The letter recited, among other things, that Origin's counsel has been combative with the participants, had been "less than forthcoming in providing information" to the participant banks and had, in fact, concealed material facts relating to "certain secret agreements" between Origin and the borrower/guarantors,[7] all of which had led them to doubt that their interests were being adequately protected in the collection efforts and to lose confidence in Origin's leadership and in Origin's selected counsel to handle the collection efforts for the purported benefit of the participants.  Demand was thus made for Origin to "step aside

---

[7]    By "certain secret agreements," counsel was referring to the agreement that led to the continuance of Origin's TRO motion in the collection action, the terms and conditions of which were not disclosed to the court, or, it is alleged, to the participant banks, most (or all) of which had counsel in attendance at what was to be the hearing on April 20.

from its lead position on the loan" and to "turn over the future handling of the collection efforts to a person selected by the majority of the participating banks, who can assume Origin's rights and duties with respect to the collection of the delinquency for the collective benefit of Origin and all the participants."

Origin declined, and in the first week of June, Peoples Bank and Planters Bank, followed by First Bank, filed suit against Origin, demanding both compensatory and punitive damages for breach of the participation agreements.  They further requested, both in their complaint and in a contemporaneously filed motion for temporary restraining order and preliminary injunction (TRO motion), an injunction removing Origin as lead bank under the participation agreements and allowing the participants to jointly select new counsel to enforce the loan documents.  That TRO motion, and the various related motions, are now before the court for resolution.

<u>Plaintiff's Requests for a Hearing and Expedited Discovery</u>

Preliminarily, the court acknowledges that plaintiffs have requested and likely have anticipated that the court would conduct a substantive hearing on their TRO motion.  Relatedly, plaintiffs have also requested expedited discovery purportedly aimed at uncovering evidence needed to prepare for such hearing.

10

It is apparent to the court, however, that regardless of whether they were granted discovery and/or a hearing, plaintiffs cannot prevail on their TRO motion.  Therefore, their TRO motion, and related motion for expedited discovery and request for a hearing, will be denied.

Plaintiffs purport in their motion to seek a temporary restraining order and preliminary injunction; the applicable procedures and standards for both are the same.[8]  Rule 65(a) requires that notice be provided to the adverse party before the court may issue a preliminary injunction.  The Supreme Court has interpreted this notice requirement to "impl[y] a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition."  Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty., 415 U.S. 423, 433 n.7, 94 S. Ct. 1113, 1122, 39 L. Ed. 2d 435 (1974); see also Commerce Park at DFW Freeport v. Mardian Constr. Co., 729 F.2d 334, 341 (5th Cir. 1984)

---

[8]    A temporary restraining order may be issued without notice under detailed procedures set forth in Rule 65(b)(1), but Rule 65(a) provides that a preliminary injunction may only be issued after notice to the adverse party.  When, as here, the opposing party is provided notice of a motion for a TRO, "the procedure that is followed does not differ functionally from that on an application for a preliminary injunction…"  11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2951 (3d ed. 2016); Dilworth v. Riner, 343 F.2d 226, 229 (5th Cir. 1965) (quoting Wright & Miller).

(explaining that Rule 65(a) mandates that where factual disputes
are presented, "the parties must be given a fair opportunity and
a meaningful hearing to present their differing versions of
those facts before a preliminary injunction may be granted").
And in the court's experience, more often than not, requests for
preliminary injunctions are decided only after the parties have
presented testimony in support of their respective positions.
Yet a party's request for a preliminary injunction may be denied
without a hearing, despite a request for one, "when the written
evidence shows the lack of a right to relief so clearly that
receiving further evidence would be manifestly pointless."  11A
Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 2949 (3d ed. 2016) (further observing that "[t]his
practice is supported by Rule 78(b), which provides that 'the
court may provide for submitting and determining motions on
briefs, without oral hearings,' and by the fact that Rule 65
does not explicitly require an oral hearing on a preliminary-
injunction motion."); see also Com. Park at DFW Freeport, 729
F.2d at 341; Bonds v. McCain, No. 1:20-CV-00293, 2021 WL
1238849, at *1 (W.D. La. Mar. 17, 2021), report and
recommendation adopted, No. 1:20-CV-00293-P, 2021 WL 1238972
(W.D. La. Apr. 1, 2021) (citing Wright & Miller, and stating,
"this Court 'convenes an evidentiary hearing [on motions for

12

preliminary injunction] only if necessary to resolve a

controlling fact issue that involves a determination of witness

credibility.'"). The present TRO motion can be decided without

the need to resolve any factual dispute involving witness

credibility, and in the court's opinion, a hearing is otherwise

unwarranted. Likewise, the court is not persuaded that any

useful purpose would be served by allowing plaintiffs to engage

in expedited discovery purportedly aimed at uncovering evidence

"related to Origin's many failures to enforce the loan and its

other ongoing breaches of the Participation Agreements" and

evidence tending to substantiate plaintiffs' belief that Origin

has "some hidden motivation for delaying enforcement and

favoring the borrower and guarantors at [plaintiffs'] expense."

    Standard for Injunctive Relief

    The purpose of a preliminary injunction is to preserve the

status quo by preventing irreparable harm until the respective

rights of the parties can be ascertained during a trial on the

merits. Miss. Power & Light Co. v. United Gas Pipe Line Co.,

760 F.2d 618, 627 (5th Cir. 1985); Nichols v. Alcatel USA, Inc.,

532 F.3d 364, 372 (5th Cir. 2008). Plaintiffs seeking a

preliminary injunction must show:

    (1) a substantial likelihood that they will prevail
    on the merits, (2) a substantial threat that they will
    suffer irreparable injury if the injunction is not

13

granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the … injunction will not disserve the public interest.

Tex. Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted); see also Clark v. Prichard, 812 F.2d 991, 993 (5th Cir. 1987) (same standard applies, whether applicant seeks TRO or preliminary injunction).  The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."  Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003) (quoting Mississippi Power & Light Co., 760 F.2d at 621).  Thus, injunctive relief will be denied if plaintiffs "fail[] sufficiently to establish *any one* of these four criteria."  Black Fire Fighters Ass'n v. City of Dall., 905 F.2d 63, 65 (5th Cir. 1990) (emphasis in original). In the present case, regardless of whether plaintiffs could establish that Origin's actions and/or inactions – or some of them – may have breached one or more terms of the participation agreements, it is clear to the court they cannot secure the injunctive relief they seek.

The court addresses the above criteria somewhat out of

14

order, looking first to the second criterion.  The requirement of substantial proof of irreparable injury should the injunction be denied requires that plaintiffs demonstrate that they face "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  Humana, Inc. v. Avram A. Jacobson, M.D., P.A., 804 F.2d 1390, 1394 (5th Cir. 1986).  Past violations can support injunctive relief, but only where the "defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future," Sec. & Exch. Comm'n v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978), as the purpose of injunctive relief "is not to punish for past violations, but to prevent future violations," Wirtz v. Lone Star Steel Co., 405 F.2d 668, 670 (5th Cir. 1968).  See also Armstrong v. Turner Indus., Inc., 141 F.3d 554, 563 (5th Cir. 1998) ("[t]o pursue an injunction … the [plaintiffs] must allege a likelihood of future violations of their rights by [the defendant], not simply future effects from past violations.").

Plaintiffs charge that Origin administered the loan in bad faith and was grossly negligent and/or engaged in willful misconduct by failing to monitor/ensure timely payment of property taxes, waiving/failing to enforce the DSC ratio, and negotiating and proposing that the participants approve an

unreasonable proposal for restructuring the loan.  Even assuming arguendo that plaintiffs could prove these allegations, that would not entitle them to injunctive relief, as there is no threat of ongoing or future harm from these alleged pre-default breaches.[9]

Plaintiffs further charge that Origin, in the wake of Haven's November 2020 default on the loan, has failed to aggressively enforce the loan, despite "constant prodding and outright demands by the Participants."  Plaintiffs, however, clearly acknowledge that "after they began pressuring Origin to pursue the guarantors, Origin belatedly filed suit"; that Origin moved for a temporary restraining order to enforce the assignment of rents "after the suggestion of Plaintiffs' counsel" that it do so; and that after the participants "pressured Origin to file (a motion for) summary judgment" against the guarantors, "Origin did so."  Thus, even if not of its own volition, Origin, following Haven's default, has taken

---

[9]    While Haven would have lost title to the collateral had the 2018 taxes remained unpaid as of August 1, 2021, it is undisputed that Haven paid the outstanding 2018 taxes prior to plaintiffs' filing of the present motion.  The requirement of this payment of the 2018 taxes was one of the conditions Origin imposed for agreeing to continue its TRO motion.  Plaintiffs herein point out that the 2019 taxes have not been paid, and that the 2020 taxes are now due.  However, there is no imminent threat of loss of collateral if those amounts are not paid immediately.

nearly every action requested or demanded of it by the participants.[10]

The court recognizes plaintiffs' position that the fact of Origin's having *filed* a summary judgment motion against the guarantors is essentially meaningless, given that almost immediately thereafter, Origin entered into a "secret agreement" with Haven and the guarantors to, among other things, hold the summary judgment motion in abeyance for at least six-months.  In fact, it is this alleged agreement, along with Origin's allegedly having concealed this agreement from the participants, that plaintiffs appear to find most objectionable.  They insist that this glaring instance of Origin's "slow-walking" its

---

[10]   Plaintiffs also complain that Origin's decision to sue both the guarantors and Haven is contrary to the participants' request that Origin file suit only against the guarantors; plaintiffs contend they were concerned that a bankruptcy of the borrower would delay the case against the guarantors.  At the same time, however, they complain of Origin's alleged "[d]elay in taking judicial action to secure the rents."  However, since the only parties to the assignment of rents agreements are Origin and Haven, it seems to the court that the proper defendant in a judicial action to secure the rents would have been Haven.  For this reason, the court also fails to perceive merit in plaintiffs' further charge that Origin breached its duty under the participation agreements by failing to pursue its TRO motion to enforce the assignment of rents against the guarantors.  In fact, once Haven filed its bankruptcy petition, the court continued its rescheduled hearing on the TRO motion *sua sponte*, not at the instance of Origin.  Furthermore, the court does not perceive the bankruptcy as having even slightly delayed this litigation against the guarantors.

17

collection efforts clearly shows that Origin's primary concern
is not to enforce the loan or guaranty agreement but rather "to
delay substantive enforcement against the Guarantors to give
them and the Borrower time to sell the project," to the benefit
of Haven and the guarantors and detriment of the participants;
and they suggest that the "real and imminent possibility that
Origin" may enter further agreements with Haven and/or the
guarantors without notice or approval warrants injunctive
relief.  However, while much has been made -- not only by the
participants but also by the guarantors themselves -- about
Origin's alleged agreement to stay its summary judgment motion,
no one has come forward with proof of any such agreement.

     For its part, Origin maintains that its *only* agreement with
respect to the summary judgment motion was that *if* the
guarantors provided certain financial documents by a certain
date, it would then *consider* agreeing to seek to hold its
summary judgment in abeyance; the guarantors did not provide the
documents and accordingly, there was never any agreement to stay
the summary judgment motion.  Plaintiffs do not purport to have
proof of the alleged agreement;[11] on the contrary, they claim

---

[11]   Plaintiffs do state in their rebuttal brief that on the day
of the scheduled TRO hearing, "Origin's counsel advised
Participants' counsel that an agreement had been reached that
included foregoing any pursuit of the summary judgment motion

that this is one of the reasons they need discovery, to obtain

evidence of the terms of the agreement by which Origin agreed to

indefinitely postpone its TRO motion, including its agreement to

hold off on pursuing summary judgment against the guarantors.

In the collection litigation, the guarantors themselves have

insinuated that Origin agreed (or may have agreed) to stay the

summary judgment motion, yet they have effectively admitted that

they have no evidence of such an agreement.  In the court's

view, given that one of the parties to the alleged agreement

denies there was an agreement and the other parties have no

proof of an agreement, plaintiffs herein have not and cannot

adduce such evidence themselves, nor can they reasonably expect

to uncover through discovery evidence that Origin ever agreed to

delay pursuing summary judgment against the guarantors (or that

it concealed any such agreement from them).

In any event, plaintiffs' claim of irreparable harm in this

regard is wholly belied by the fact that this court has already

entered summary judgment in favor of Origin on the guarantors'

liability under their guaranty agreement.  What is left to be

determined is the amount of their liability; and that issue is

currently being actively litigated via Origin's summary judgment

against the Guarantors for six months."  The e-mail they cite as
evidence contains no such statement by Origin's counsel.

motion in Origin's collection action against the guarantors.[12]
Thus, it is clear from the foregoing that there is neither a
likelihood that plaintiffs could succeed on the merits of their
claim that Origin breached the participation agreements by
failing to pursue summary judgment against the guarantors, nor
is there in any event any threat of irreparable harm from any
alleged failure by Origin to immediately seek and pursue summary
judgment.

There is no specific allegation by plaintiffs of any
further specific ongoing breach by Origin of the participation
agreements; rather, there is only their purported perception
that Origin, having failed thus far to aggressively enforce the
loan documents and guaranty agreement, will likely continue its
foot-dragging, to the participants' detriment.  But that is no
more than speculation, and speculation will not support
injunctive relief.[13]

Moreover, even assuming plaintiffs could prove some ongoing
breach of the participation agreements, they would not be

---

12   Origin's submission on the issue has been received; the
guarantors' response submission is due August 30.

13   Plaintiffs' vague assertion that Origin "has failed to take
aggressive action in [Haven's] bankruptcy" does not suggest an
ongoing violation and in any event, obviously does not support
injunctive relief.

entitled to any of the injunctive relief they request.  In their
motion, plaintiffs requested an injunction "removing Origin as
the lead bank under the participation agreements and allowing
the Participants to jointly select new counsel to enforce the
Loan Documents against the Borrower and Guarantors for the
benefit of *all*."  (Emphasis in original).  In their rebuttal,
they purport to clarify that what they are actually seeking is
an injunction "removing Origin as lead bank for the *limited*
purpose of allowing both Origin and the Participants to jointly
select independent counsel to enforce the Loan Documents for the
benefit of all."  Plaintiffs cannot have Origin literally
"removed" as lead bank, since to do so would contravene the
express terms of their participation agreements, under which
Origin is the lead bank, and is expressly "entitled, *at its
option*, *and without the consent of [participants]* from time to
time, and at any time, *to exercise any rights or remedies* under
on in respect of any Loan Document, *or refrain from exercising
any right or remedy*, upon the occurrence of a default under the
Loan Documents or at any other time."  (Emphasis added).  That
does not mean it has unfettered discretion to do as it pleases;
but it does mean that the participants expressly relinquished
control of these decisions to Origin.  Furthermore, Origin, as
the sole lender on the loan documents and guaranty agreement, is

21

the sole party with a right to enforce those agreements.  The participants are not parties to either agreement and, as a matter of law, have no right to seek enforcement of them. Plaintiffs do not contend otherwise.

So, acknowledging that they cannot replace Origin as lead bank, they seek instead to do indirectly that which they cannot do directly, namely, take control of the lead bank's rights and responsibilities by removing Origin's chosen counsel and installing counsel of their choosing to do their bidding. Plaintiffs would dispute this characterization, but as the court sees it, there is no other way to reasonably construe what they propose.  They argue that the injunction they request –- which is merely to let Origin and the participants "jointly select independent counsel" -– "will not rewrite the agreement or give them greater control."  But that is precisely what an injunction would do.  In the court's opinion, there is no valid basis, in fact or in law, for doing so.

Plaintiffs charge in their motion that Origin's chosen counsel, Sarah Beth Williams and the Phelps Dunbar law firm, "are operating under a conflict of interest in enforcing the Loan Documents *on the Participants' behalf* and for their benefit … while also representing Origin adversely against the

22

Participants" in this litigation.  (Emphasis added).  Ms.
Williams and her law firm, however, are not counsel for the
participants; they are counsel for Origin.  Apparently realizing
this, plaintiffs undertake in their rebuttal to clarify that
they are not claiming that the participants have an attorney-
client relationship with Origin's counsel, and they further
explain that they are not arguing that Origin's counsel has
violated the Mississippi Rules of Professional Conduct's
conflict-of-interest rules.14  Yet they still want this court to

---

14   Plaintiffs claim that following a May 17 "heated
teleconference" in which they demanded that independent counsel
take over collection efforts, Origin's chief risk officer
"searched through is old e-mail and forwarded" to them a May 21
e-mail he had received from Phelps Dunbar announcing that Ms.
Wilson had been elected as Chairman of the Mississippi Board of
Banking Review—"an agency that regulates and oversees the
participating banks that Origin's counsel is supposed to be
benefitting."  They purport to have interpreted this e-mail as a
threat, and assert that by sending this "threatening" e-mail,
Origin has "exacerbated" the issue of Ms. Wilson's conflict of
interest and made it all the more imperative that Origin be
removed as lead bank "to avoid this continuing and worsening
conflict of interest."  Plaintiffs' allegation that Origin
threatened, or that they reasonably perceived that Origin had
threatened that Ms. Wilson would use her position as Chairman of
the Mississippi Board of Banking Review to harm their interests
is unfounded and, although acknowledged, will be disregarded.
Origin points out in its response, that by statute, the Board of
Banking Review has responsibility only for applications for new

remove Ms. Williams -- who is admittedly not in violation of any

Rule of Professional Conduct governing conflicts of interest --

as counsel *for Origin*, and to replace her with "independent"

counsel that the parties "jointly" select.[15]  How this is any

less an attempt by plaintiffs to take control over enforcement

of the loan and guaranty agreements than the outright

replacement of Origin as lead bank eludes the court.   Neither

can be countenanced.[16]   To do so would take rights exclusively

---

bank charters, conversion charters and protested branches, none
of which applies to any of the participants.

15   It is unclear to the court how they would accomplish this
"joint" selection; it is even less clear who plaintiffs intend
would be the client once their new independent counsel was
chosen.  Origin?  The collective group, comprised of Origin and
the participants?  It is a further mystery who would decide how
"to enforce the loan for the benefit of all"?  Who would "ensure
that Origin complies with [the] written contractual terms it is
already obligated to follow"?  The participants?  Their
independent counsel?
     The court recognizes these are all questions the court
could put to plaintiffs if it had granted their request for a
hearing.  A hearing is not necessary for this purpose, however,
because the court cannot fathom any answer they might offer that
could persuade the court that the injunction they seek is
arguably appropriate.

16   Plaintiffs claim in their rebuttal that Origin "admitted"
in its response that it had made other non-participated loans to
affiliates of the borrower, which, they say, creates a conflict
of interest and "explains why Origin would favor the interests
of the Borrower and Guarantors over the rights of the
Participants."  Origin said nothing in its response about having

24

held by Origin under the express terms of the parties'
agreements and give them to plaintiffs.  This would assuredly
result in greater harm to Origin than any speculative harm
plaintiffs could potentially suffer should the injunction be
denied.[17]  And in the court's opinion, to grant the motion would
also result in disservice to the public interest in enforcement
of contractual agreements according to their terms.

---

made any *non-participated* loan or loans to Haven, the
guarantors, or any affiliates; and in its surrebuttal, Origin
has presented evidence that there were no such loans.  But even
if Origin had done so, and even if Origin had a conflict of
interest as a result of having done so, that would not support
an injunction removing and replacing Origin's attorney.

17    For purposes of injunctive relief, irreparable injury is
harm that "cannot be undone through monetary damages," that is,
harm for which money damages are inadequate or for which money
damages are "especially difficult" to compute.  Deerfield Med.
Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir.
1981); Allied Marketing Group, Inc. v. CDL Marketing, Inc., 878
F.2d 806, 810 fn. 1 (5th Cir. 1989).  The "central inquiry in
deciding whether there is a substantial threat of irreparable
harm to the plaintiff is whether the plaintiff's injury could be
compensated by money damages."  Allied Marketing Group, Inc.,
878 F.2d at 810 fn.1.  Plaintiffs assert that money damages
would be difficult to compute, so that they face irreparable
harm, because they are heavily-regulated entities with a problem
loan on their books, which has to be reported to bank examiners;
that they are consequently subject to regulatory restrictions
and scrutiny, which affects their ability to extend credit to
other customers.  Even assuming this could constitute
irreparable harm, it is nevertheless speculative harm.  There
are too many variables and uncertainty to predict with any
assurance that some new "independent" counsel would achieve as
good or better results any sooner than Origin's present counsel
could.

<u>Conclusion</u>

Based on all of the foregoing, it is ordered that plaintiffs' motion for temporary restraining order and preliminary injunction is denied; plaintiffs' motion for expedited discovery is denied; plaintiffs' motion to strike Bryan Bryson's affidavit is denied; Origin's motion to file a surrebuttal is granted in part and denied in part.

SO ORDERED, this 24th day of August, 2021.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE